NEW ORLEANS & N. E. R. Co. *v.* POPLARVILLE SAWMILL Co.

(Division A. May 14, 1923. Suggestion of Error Overruled May 28, 1923.)

[96 South. 647. No. 23023.]

1. CONTRACTS. *Whether dependent or independent usually determined by provisions of contract; tendency to construe covenants of contract dependent unless terms show contrary.*
   Whether a covenant is dependent or independent is usually determined by the provisions of the contract itself. The tendency of the courts is to construe the covenants of a contract as dependent unless the contrary intention appears from its terms.

2. CONTRACTS. *Stipulation in contract for rails for logging railroad held dependent, and not independent, covenant.*
   A railroad company engaged in the business of a common carrier of freight entered into a contract with a sawmill company own-

ing timber lands in reach of the line of said railroad company, in which it was agreed by the parties as follows: That for a stipulated annual rental the railroad company would lease to the sawmill company sufficient relay rails and fastenings to construct a logging railroad into the timber lands owned by the latter connecting with the line of said railroad company, for a term of five years, with an option on the part of the sawmill company at any time during or at the expiration of said five-year period to purchase said rails and fastenings from the railroad company at a stipulated price, and that the sawmill company would use said rails and fastenings to construct said logging railroad and for no other purpose, and ship the manufactured product of its timber from said timber lands over the line of the said railroad company, provided freight rates therefor were no higher than the rates of any competitive railroad; that the consideration moving to the railroad company was not only the sums of money to be paid it by the sawmill company but in addition the faithful performance of the covenants in the said contract entered into by said sawmill company. Under said contract the railroad company furnished the sawmill company sufficient rails and fastenings to build part of said logging road, but refused to deliver a sufficiency to complete the same. The sawmill company exercised its option to purchase the said materials and demanded the delivery of the balance, signifying its readiness and willingness to pay the purchase price stipulated in the contract, admitting, however, that it did not intend to use said rails and fastenings to complete said logging road, but that its purpose was to sell them in the market for speculation. The railroad company declined to deliver the balance of said rails and fastenings upon the ground that it was not bound to do so unless they were to be used in the construction of said logging road. *Held*, the stipulation in said contract giving the sawmill company the right to purchase said rails and fastenings was a dependent, and not an independent. covenant; that it was conditioned upon the use thereof by the sawmill company in the construction of said logging road as a feeder for the business of said railroad, and therefore the railroad company did not breach its said contract in refusing to deliver the balance of the rails and fastenings.

Appeal from circuit court of Pearl River county.

Hon. G. Wood Magee, Special Judge.

Suit by the Poplarville Sawmill Company against the New Orleans & Northeastern Railroad Company. From

judgment for plaintiff, defendant appeals.   Reversed and judgment rendered.

*Bozeman & Cameron,* for appellant.

The giving of the peremptory instruction amounted to a holding by the court that, as a matter of law, none of the .defenses interposed by the railroad company were meritorious.  If any one of them was well taken, or if there was testimony in the record which tended to sustain any of them, the action of the court was, of course, erroneous. It will be helpful, therefore, to list these defenses and discuss them.

The railroad company was not bound to deliver for resale.  It becomes necessary, under this heading, to determine just what the parties meant by the contract they executed on May 29, 1917.  The mill company claims that the option to purchase given in section 3 of the contract is an independent stipulation and that this right existed absolutely and at all events and without reference to the other provisions of the contract.  The railroad company contends that this is not a fair construction of the contract and that all the terms of the contract are interdependent and that the right to claim under one provision depends on the performance of the reciprocal obligations.  Our contention is borne out when one considers the *status* or situation of the parties, the negotiations which led to the contract, and the language of the contract itself.  It will be borne in mind that the party contracting to deliver this rail was a railroad company and not a manufacturer or broker of rails, and its activities could and would logically be directed towards the furtherance of the rail-road business; and that the party to whom the rail was to be delivered was a concern engaged in the manufacture of timber into lumber and the sale of the finished product, and logically any contract they would make would have in view the realization of this object.  The sole

object the mill company had in view when it approached the railroad company was to lease some rail and the sole purpose that this rail was to be put to was the construction of the track which would ultimately bring business to the railroad. That the mill company realized this before the contract was delivered appears from its letter. The contract itself clearly shows that the parties intended by it to limit any right the mill company might have to purchase the rail by the purpose for which it was to be used.

It will be noted at the outset the parties are denominated as lessor and lessee, respectively, thus showing that 'the parties realized that they were making a lease contract and that every provision in the contract related to and was limited by the terms governing the lease. In the opening paragraph of the contract proper, it is stated that the railroad company agrees to three propositions, said agreement being based on "consideration of the rents or sums of money herein reserved to be paid to it by the lessee, and of the covenants of the lessee upon its part faithfully to be kept and performed as hereinafter expressed." It is plain, therefore, that all promises of the railroad company were conditioned, not only on the payment of the money they were to receive, but upon the performance of the obligations imposed by the contract on the Mill Company.

*Stevens & Heidelberg,* for appellee.

Was the railroad company bound to deliver the rail in question for any purpose other than to be placed in appellee's railroad? In order to determine this question, the court will have to read the contract and construe the contract. No cited authorities in appellant's brief can throw any light whatsoever on the proper construction of this contract. No general authority that might be cited can aid the court, as we see it, in the proper interpretation and construction of this contract. It is a thing which

must be read by the court and construed by the court. Before beginning the discussion of the proper interpretation of this contract, however, we want to take issue with appellant in its statement with reference to the situation of the parties and what led up to the execution of the contract and what the parties might have had in mind at the time the contract was executed. In the first place, appellant contends in its brief that the railroad company was not engaged in the sale of steel rails; that that was a thing that was never contemplated by either party to this contract; that neither party wanted anything other than a lease by the railroad company to the appellee of the steel rail in question. A general form of contract was in use by the railroad company at that time. This regular form of contract used by it contained a provision that the lessee would have the option of purchasing the rail. Lessee entered into this contract with this idea in mind, knowing that it was the same contract which was usually used by the railroad company, it would give him this right, and on the very day when he signed the contract and returned it to the railroad company, he then and there by letter notified the railroad company that it was his ultimate object and purpose to exercise the option of purchasing the steel rail in question.

Paragraph number nine is the only paragraph in the contract dealing with the obligations of the appellee which is not absolutely inconsistent with the exercise of it by its option to purchase the rails, and even this paragraph is susceptible of two constructions. This paragraph requires the appellee to ship or cause to be shipped over the lines of the railroad company and its connections, all freights used or produced in and about the business of the appellee, provided the rates which are offered the appellee by the railroad company are not in excess of those offered by competing carriers for similar services. As stated, this paragraph of the contract is susceptible of two constructions. It could be reasonably contended, we admit, that it

matters not whether the appellee was the owner of the rails or whether the appellant was the owner of the rails, still, this provision of the contract could be enforced and it would not be inconsistent with ownership of the rails on the part of the appellee.   Still, on the other hand, it can be reasonably and plausibly argued that even this paragraph of the contract is dealing with the parties only so long as the relation of lessor and lessee existed.   In other words, what right would the railroad company have to insist that freight originating on a line of railroad that belonged entirely to the appellee, should be shipped over the appellant's ralroad line?   It could be very well contended by appellant that so long as its property entered into the construction and operation and maintenance of the connecting carrier, that the freight originating on that connecting carrier should be shipped over its lines, but when its property was taken away from the connecting carrier or when it sold the property absolutely to the owner of the connecting carrier so that the railroad company had no property in the connecting line, had no interest in the connecting line, it then would have no right to insist that the connecting line deliver all of its freight to the appellant railroad company.   However, it matters not what construction might be placed upon this paragraph of the contract, for the reason that there is no contention whatsoever in this case that the appellee breached this provision of the contract.   So far as this record discloses, every pound of freight originating on the mill company's line of railroad was delivered to the appellant railroad company in accordance with the terms of paragraph nine of the contract.   The railroad company waived its rights to insist that this rail could be used only for the purpose of being used in a logging railroad, because it offered to deliver the balance of the rail after it learned what the mill company intended to do with it.   Long after the railroad company had acknowledged what the mill company intended to do with this rail, it offered to deliver the rail.

What is or is not the proper interpretation of a contract, is a matter of law to be passed on by the court and not an issue of fact to be decided by a jury.   Therefore, it was entirely proper that the lower court should have construed this contract and not have submitted its construction to the jury.   We don't think the court needs any citation of authorities on this proposition.

Argued orally by *B. F. Cameron* for appellant and *R. W. Heidelberg* for appellee.

*Anderson, J.,* delivered the opinion of the court.

The appellee, Poplarville Sawmill Company, a Kentucky corporation, sued appellant, New Orleans & Northeastern Railroad Company, a Louisiana and Mississippi corporation, in the circuit court of Pearl River county for damages for an alleged breach of contract by appellant by the terms of which appellant leased to appellee twelve miles of relay rails and angle bars with the option on the part of appellee to purchase same, and recovered a judgment against appellant, from which this appeal is prosecuted.

The trial court directed a verdict for appellee on the issue of liability, and refused appellant's request for a directed verdict in its favor, which action of the court is assigned as error.

The contract sued on, leaving off the signatures and acknowledgments of the parties, follows:

"An agreement made and entered into this 29th day of May, 1917, by and between New Orleans & Northeastern Railroad Company, a corporation organized and existing under and by virtue of the law of the state of Louisiana and Mississippi, hereinafter for convenience styled the railroad company, party of the first part, and Poplarville Sawmill Company, a corporation organized and existing under and by virtue of the law of the State of Louisiana hereinafter for convenience styled lessee, party of the

second part, witnesseth that the railroad company, for and in consideration of the rents or sums of money herein reserved to be paid to it by the lessee, and of the covenants of the lessee upon its·part faithfully to be kept and performed, as hereinafter expressed, hereby agree :

"(1) That it will furnish and deliver to the lessee f. o. b. cars of the railroad company, at Poplarville, Mississippi, a sufficient quantity of relaying rails and· fastenings to lay and construct a logging railroad track to extend from a connection with a track of the railroad company at or near said Poplarville, Mississippi, thence in a general southerly direction for a distance of twelve (12) miles, more or less, to and into certain timber lands, owned or controlled by the lessee situated in the counties of Pearl River and Hancock, Mississippi; said logging railroad track to be located entirely within the limits of said counties, the estimated quantity of rails and fastenings required for same being.

126,720 feet of 60-lb. relay rails......1,131 tons, 960 lbs.
7,600 60-lb. angle bars.............    57 tons, 1,520 lbs.

Total ...........................1,189 tons, 240 lbs.

"Provided, however, and it is distinctly understood and agreed that the railroad company does not obligate itself under the terms of this agreement to furnish the lessee with any rails other than, or in excess of, those above described, and, so far as angle bars are concerned, will be expected to furnish such serviceable ones as are released with said rail and are available to the railroad company at the time of the delivery of said rail.

"(2) That it will and hereby does lease the said rails and fastenings unto the lessee, its successors and assigns, for the full terms of five (5) years next ensuing from and after the average date of delivery of said rails and fastenings to the lessee, as aforesaid, which said average date shall be ascertained from the account to be kept by the railroad company showing the date of delivery and tonnage

of each lot of rails and fastenings delivered, upon the lessee's yielding and paying, however, unto the railway company, an annual rent or sum equal to the interest at the rate of six per cent. per annum upon the valuation of the rails and fastenings actually delivered hereunder at the agreed rate of thirty dollars ($30) per ton of the aggregate weight thereof, plus an additional sum of money equal in amount to the cost of the freight charges on said rails and fastenings hereinbefore described and hereby leased from Danville, Kentucky, to Meridian, Mississippi, and the said rental to be payable in equal monthly installments, in advance, and the said additional sum of money to be payable in the manner following, that is to say: One-fifth (⅕) in cash, as of the average date of delivery of said rails and fastenings, and the remaining four-fifths (⅘) in four (4) equal deferred payments, payable one, two, three, and four years, respectively, after such average date of delivery, with interest at the rate of six per cent. per annum until paid.

"(3) That the railway company will, and hereby does, grant unto the lessee the option to purchase the said rails and fastenings hereinabove described and hereby leased at any time during the said term of five (5) years hereby created, or at the expiration thereof, and will and hereby does covenant and agree to sell the said rails and fastenings upon notice, in writing, served upon it by the lessee of its election to purchase the same, at and for the sum and price of thirty-two ($32) dollars per gross ton of the aggregate weight thereof, it being understood that the total purchase price of said rails and fastenings, in the event of the exercise by the lessee of the option to purchase the same, shall be paid unto the railway company in cash.

"And the lessee hereby covenants and agrees:

"(4) That it will pay the rents herein reserved in the manner specified.

"(5) That it will not assign this lease or sublet said rails and fastenings or any part thereof to any third person

or persons except upon the consent in writing of the railway company.

"(6) That it will use the said rails and fastenings for the purpose of constructing and operating the proposed logging railroad hereinbefore described, and no other, and that it will not permit any traffic to pass over the same, except such as passes over the lines of the railroad company, or such as both originates and terminates on the lines of the lessee, without the consent in writing of the railroad company to such additional use, and paying therefor such additional rental as may be agreed upon between the railroad company and the lessee.

"(7) That it will pay all taxes which may be assessed upon the said proposed logging railroad track of the lessee, or against the railroad company by reason of its ownership of said rails and fastenings.

"(8) That it will at all times during the life of this agreement keep a sufficient number of cross-ties under said rails to prevent the same from bending or kinking.

"(9) That it will ship or cause to be shipped, over the lines of the railroad company and its connection, all freights used or produced in or about the business of the lessee, provided, however, that rates are offered said lessee by the railroad company which are not in excess of those of competing carriers for similar services performed under substantially similar circumstances and conditions.

"(10) That in the event that the lessee shall be in default for thirty (30) days in the payment of any installment of the rent herein reserved, after the same shall be due, or shall violate any other of its covenants in this agreement contained, then forthwith upon such default or violation, and at all events upon the expiration of the term hereby created, the lessee will return said rail and fastenings to the railroad company in good condition, ordinary wear and tear excepted, loaded upon cars of the railroad company at said Poplarville, Mississippi, unless the lessee shall in the meantime have purchased the same from

the railroad company under the option hereinbefore granted, or, in default thereof, the railroad company may enter upon said track of the lessee, take up the said rails and fastenings, load the same upon the cars and deliver at said Poplarville, Miss., but at the cost and expense of the lessee, and again possess and enjoy the same as of its own proper estate.

"(11) That it will execute and deliver to the railroad company its bond, underwritten, at the cost and expense of the lessee, by such good and sufficient corporate surety or sureties as may be approved by the railroad company, in the penal sum of thirty-five thousand seven hundred dollars ($35,700) conditioned upon the faithful compliance by the lessee with its covenants contained in the foregoing paragraph numbered ten (10) of this agreement.

"In witness whereof, the parties hereto have caused these presents to be executed and their respective corporate seals to be hereunto affixed and attested by their respective officers thereunto duly authorized, the day and year first above written."

Appellant delivered to appellee sufficient rails and bars to construct six miles of the logging railroad contemplated by the contract, with which that much of the road was constructed by appellee. However, several months later appellant refused to deliver to appellee the required amount of rails and bars to complete said logging road, and seeks to justify its refusal so to do upon the ground that appellee had abandoned its purpose to use said bars and rails to complete said logging road, but intended to use them for the purpose of resale in the market for speculation. That appellee so intended is an established fact in the case about which there is no controversy. Was appellant justified in refusing to deliver the balance of the rails and bars because of the existence of that fact? The question turns upon whether the stipulation in paragraph 2 of the contract giving appellee the option to purchase the rails and bars is a dependent or an independent cove-

nant. Whether a covenant is dependent or independent is usually determined by the provisions of the contract itself. The tendency of the courts is to construe such covenants as dependent unless the contrary intention appears from the terms of the contract. 2 Elliott on Contracts, p. 865, section 1578, and cases in note.

Appellant's contention is that the option to purchase given appellee was conditioned upon the performance of the covenants undertaken by the latter, one of which it says was an agreement by appellee to use the rails and bars in building said logging road, and therefore constituted a dependent covenant, while the appellee contends that said option to purchase stood out alone and was independent, and was granted regardless of the purpose for which it might see fit to use the rails and bars. We are of opinion that it is not necessary to resort to the evidence in the case to determine this question, but that it is solvable by the terms of the contract itself. Taking the contract as an entirety, there appear to be two outstanding thoughts embodied therein upon which all of its other provisions are more or less dependent—one, on the part of appellee, that it desired a logging road to reach its timber lands about twelve miles into the interior for the purpose of manufacturing the timber thereon into lumber and marketing same by means of a connection of said logging road with appellant's line of railroad; the other, that appellant desired to encourage the construction of said logging road so that it might be a feeder to its business of a common carrier of freight and thereby increase its revenues. At first glance, as well as on a careful consideration of the terms of the contract, only one reasonable conclusion can be reached, and that is that the controlling consideration moving to appellant for the lease of the rails and bars as well as for the option to purchase was the construction by appellee of a logging road to its timber lands to serve as a feeder for appellant's road. And an analysis of the separate provisions of the contract leads to the same conclusion.

In paragraph 6 it is provided, among other things, that appellee *"will use the said rails and fastenings for the purpose of constructing and operating the proposed logging railroad heretofore described and no other."* (Italics *ours.*)

It it had been intended that this stipulation should not be in force in case appellee purchased the rails and bars, naturally it seems a proviso to that effect would have been added in this paragraph or elsewhere in the contract. In the opening paragraph of the contract the consideration moving to appellant is stated to be not only the money that was to be paid appellant by appellee, but in addition the performance of the covenants by the appellee "upon its part faithfully to be kept and performed as heretofore expressed." It has been seen that one of the covenants undertaken by appellee was that said rails and bars would be used in the construction of a logging road to its timber lands.

It is provided in paragraph 1 of the contract that appellant would deliver appellee a sufficient quantity of rails and fastenings "to lay out and construct a logging railroad track to extend from and connect with a track of the railroad company at or near Poplarville, thence in a general southerly direction for a distance of twelve (12) miles, more or less, to and into said timber lands." Then follows a statement that the timber lands to be reached were located in Pearl River and Hancock counties, and the logging railroad was to be located entirely within those counties, and an estimate of the quantity of rails and fastenings in weight necessary to build the twelve miles of logging road. And it is stipulated in a proviso to this paragraph that "it is distinctly understood and agreed that the railroad company does not obligate itself under the terms of this agreement to furnish the lessee with any rails *other than, in excess of, those described above,'* etc. (Italics ours.) By this language it was emphasized that the minds of the parties were fixed on a sufficiency of rails and bars

to lay twelve miles of logging road, and not so many rails and bars in weight. Thus from the beginning to the end of the contract there run through it two dominating thoughts —the building of a logging road by appellee to its timber land to enable it to market its timber, and the furnishing by appellant for that purpose a sufficiency of secondhand rails and fastenings, with a view of thereby increasing its freight tonnage. There is nothing in the contract, looking at it either from its four corners or its separate parts, indicating that the parties had in mind that appellee should have the right under the option to purchase to use said rails and bars for any other purpose than the building of said logging road. And furthermore, if there were any ambiguity in the contract on the subject, it is entirely cleared up by the evidence, which shows that the parties at the time it was made had in mind just the considerations we have found from the face of the contract existed.

Appellant did not waive its right to this defense either by silence or its failure (if there was such) to place its refusal to deliver the balance of the rails and bars when demanded on that ground. There was no consideration for such alleged waiver, and there is no element of estoppel, for appellee was not misled or harmed.

It follows from these views that the trial court erred in refusing to direct a verdict for appellant, and therefore, of course, should not have directed a verdict for appellee on liability.

Reversed, and judgment here for appellant.

*Reversed.*